Filed 11/6/14  M.R. v. Super. Ct. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| M.R., | |
| Petitioner, | E061716 |
| v. | (Super.Ct.Nos. J247069 & J247070) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Lily L. Sinfield, Judge.  Petition denied.

Michelle Gilleece for Petitioner.

No appearance for Respondent.

1

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Real Party in Interest.

Petitioner M.R. (father) filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452, challenging the juvenile court's order terminating reunification services as to his children, F.R. and A.R. (the children) and setting a Welfare and Institutions Code[1] section 366.26 hearing.

Father contends there was insufficient evidence to support the court's finding that it would be detrimental to return the children to his custody, and that the court erred in reducing his visitation prior to the section 366.26 hearing.  We deny his writ petition.

FACTUAL AND PROCEDURAL BACKGROUND

On November 30, 2012, San Bernardino County Children and Family Services (CFS) filed section 300 petitions on behalf of the children.  F.R. was 19 months old at the time, and A.R. was three years old.  The petitions alleged that the children came within the provisions of section 300, subdivisions (b) (failure to protect) and (g) (failure to support).  Both petitions included the allegations that father had a substance abuse problem, he had engaged in domestic violence problems in the presence of the children, and he left F.R. unsupervised in an unlocked car in cold weather for an extended period of time.  The petition further alleged that father was currently in custody.  A.R.'s petition additionally alleged that he came within section 300, subdivision (j) (abuse of sibling).

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

2

The social worker filed a detention report and stated that she responded to a referral on November 27, 2012, alleging general neglect and caretaker absence. Father had left F.R. alone in an unlocked car, in 40 degree weather, for three hours. The police received a 911 call, and when the officer responded, he found the child sleeping in the cold vehicle. He waited 10 minutes for backup to arrive, then went to the closest residence, where he found father. Two other people at the home were intoxicated, but father did not appear to be under the influence. The officer said that father felt the child was fine outside; father said he was checking on him. The officer arrested father for child endangerment. The whereabouts of the children's mother (mother) were unknown at that time.[2] Father told the police he had another son, A.R., who was at the paternal grandmother's house, where he resided. The paternal grandmother called the social worker the following day and said she would be willing to keep A.R. as long as needed, but F.R. would be too much work. The social worker was not able to clear the paternal grandmother during the relative assessment process. Thus, she obtained a warrant, removed A.R., and placed him in the same foster home as F.R.

The court held a detention hearing on December 3, 2012 and detained the children in foster care.

---

[2] Mother is not a party to this writ. Thus, this opinion will focus mainly on the facts and issues pertaining to father.

3

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on December 21, 2012, and recommended that the court declare the children dependents of the court and provide mother and father (the parents) with reunification services. Father's case plan included the requirements that he participate in counseling, a domestic violence program, a parenting education program, an outpatient substance abuse program, and substance abuse testing. The social worker reported that mother and father were married in 2010 but were in the process of getting a divorce. Mother said their history of domestic violence and father's incarcerations led to their relationship's demise. The parents were living together when A.R. was conceived and born, but not when F.R. was conceived and born. Father was listed on both children's birth certificates, and he held both children out as his own. The social worker thus recommended that father be declared the presumed father of both children.

On December 27, 2012, the court referred the matter to mediation to resolve the jurisdiction/disposition issues. The court also continued the matter to January 17, 2013, for a contested jurisdiction/disposition hearing.

The court held a contested jurisdiction/disposition hearing on January 17, 2013, and found father to be the presumed father of the children. The court amended the allegation concerning father's substance abuse problem to read that he used medical marijuana, which impeded his ability to appropriately care for the children. The court found this allegation and others true and declared the children dependents of the court.

4

The court ordered the parents to participate in reunification services. It also ordered visitation with father to begin upon his release from incarceration, but also pending the resolution of a criminal restraining order.

The social worker filed an interim review report on March 4, 2013, and reported that, at the last hearing, a copy of a criminal domestic violence order was submitted to all parties. The protective order named father as the person to be restrained and listed mother, the children, and two other individuals as the persons to be protected. That order was to expire on December 10, 2015. However, on February 4, 2013, the court issued another protective order, which is to expire on December 10, 2022. The social worker spoke with father, who said he was aware that the restraining order had been revised and that he would not be allowed any visitation with the children until he got it revised again. He said he was released from custody on February 13, 2013.

*Six-month Status Review*

The social worker filed a six-month status review report on July 15, 2013, and recommended that father's reunification services be terminated. After his release from custody, father moved in with family members in Crestline, California. The social worker referred him to the services closest to his residence; however, he failed to regularly participate in any of his programs. He missed three intake appointments for his individual counseling and missed three parenting classes. Father also had not taken any steps to resolve the criminal restraining order. Thus, he had not had any contact with the children since their initial removal. Because father was not making progress with his

5

case plan, and his lack of visitation prohibited him from bonding with the children, the social worker opined that continued services would not benefit the children. Thus, the social worker recommended that his reunification services be terminated.

At the July 17, 2013 review hearing, the matter was set contested on behalf of father and continued to August 28, 2013. At the hearing on August 28, 2013, father testified. He said that after being released from custody, he enrolled in services. He had trouble with transportation to his classes, so he was dropped from his classes. However, he enrolled in classes closer to him and was now attending domestic violence, child endangerment, and anger management classes, through the criminal court. The criminal court had ordered him to complete a 52-week domestic violence program. He also said he now had a fulltime job. Father felt like his life was more stable now because he had a new girlfriend he was living with, and she was letting him use her car and making sure he was getting to his classes.

The social worker also testified, and said that father was initially enrolled in parenting classes at Rim Family Services. She tried to help him with his transportation issues. However, he was eventually terminated from Rim Family Services, and they told him he would have to look elsewhere. The social worker started trying to locate services for him in late June 2013. The social worker said he was referred to another counseling place, but she had not received a progress report yet. She also said that father just started a substance abuse outpatient treatment plan the previous week.

After the testimonies, county counsel argued that father had essentially been terminated from every program, except what he was required to do through his probation. Thus, he had failed to regularly participate or to make substantive progress in his case plan. The court stated that it had read and considered the social worker's report and the evidence presented that day. The court believed that father had started his services, and opined that a large motivating factor was his girlfriend. The court found it disingenuous, to some degree, when father blamed his lack of participation on transportation problems. The court opined that father's motivation did not begin until after his relationship with his girlfriend started. The court adopted the social worker's findings that, among other things, father had failed to participate regularly and make substantive progress in his case plan, and the extent of progress made toward mitigating the causes necessitating placement had been minimal. The court thus terminated father's reunification services. The court continued mother's reunification services.

*12-month Status Review and Section 388 Petition*

The social worker filed a 12-month status review report on January 6, 2014, and recommended that services for mother be continued. The social worker reported that, since the last hearing, father was successful in having his criminal protective order modified, which allowed him to have contact with the children. Thus, father began visitation with the children in late November 2013. The social worker reported that there had been conflicts between father and the maternal family. The social worker received phone calls about how father was not working, how he stole a bracelet belonging to the

7

maternal grandmother, how he stole mother's car, and how he was seen by several people high and on drugs.

On January 13, 2014, father filed a section 388 petition asking for the children to be returned to his home to live with him and his new wife. As to changed circumstances, he alleged that he had the criminal restraining order modified, he had numerous visits with the children and was bonded with them, he was continuing to drug test clean, he was finishing his classes, and he was working full time. As to best interest of the children, father alleged that he had a stable home, enough space, love to offer the children, the security of a family, and a stable job. He further alleged that he was their father and loved them and wanted to "do what [was] right by them." The court granted a hearing and set it for February 19, 2014.

The court held a 12-month review hearing on January 16, 2014, and continued mother's services. The court ordered father's visitations to be once a week, for four hours each time.

The social worker then filed an interim review report on February 19, 2014, in response to father's section 388 petition. The social worker reported that she met with father and his new wife at their residence. She inspected the residence and found no safety concerns. Father's wife had two sons, ages three and nine. The nine-year-old spent the week with his father and weekends with his mother. Father's wife was a stay-at-home mom. The social worker further reported that, since the termination of his services, father had met his wife, secured employment, and participated in services that

8

were originally ordered as part of his reunification plan. He had since completed parenting classes and drug treatment, and had been testing clean once a month. He had participated in half of his 52-week domestic violence program and was working on completing it. Father had also been visiting the children, and his visits were appropriate. As to his medical marijuana use, father said he had not used since his release from custody in February 2013. The social worker opined that it was premature to allow the children to return to father's care. His wife had not had the opportunity to interact with the children, and the children had not had the chance to become accustomed to father's residence. Thus, the social worker recommended that father's reunification services be reinstated for six months, that his current supervised visits should include his wife and her two children, and that visits would later move to unsupervised visits and/or overnight visits.

On February 19, 2014, the court granted father's section 388 petition and ordered reunification services to be provided. The court also ordered unsupervised visitation to be a minimum of one time a week, with overnights, weekends, and return of the children "by way of an approval packet."

*18-month Status Review*

The social worker filed an 18-month status review report on May 21, 2014, recommending that the children be returned to father's home and the dependency continued under family maintenance. The social worker recommended that mother's services be terminated. The social worker reported that father had been visiting the

children, and the foster mother reported that the children would come back after visits much calmer than they did after visits with mother. Father completed a parenting and substance abuse program, and he was re-enrolled in individual counseling and was referred for random drug testing. The social worker verified that father was participating in the 52-week domestic violence program ordered by the criminal court, and she was awaiting a progress report. Father was currently employed and was renting a suitable home with his new wife and her children. The social worker opined that return of the children to father would not create a substantial risk of detriment. However, she recommended continued supervision through family maintenance. The social worker stated that father should continue to drug test on a random basis, and he needed to complete his domestic violence program.

The court held an 18-month review hearing on May 28, 2014. The social worker requested a 30 day continuance to investigate new information it had received. CFS was just informed the previous night of recent domestic violence in father's home, and that father was not living in the home but in his truck. The court continued the matter to June 30, 2014.

The social worker filed an addendum report on May 30, 2014, and recommended that reunification services for father be terminated. The social worker reported that, on May 27, 2014, she received a phone call from father's wife, who said she was tired of lying about father. Father's wife said that, on May 25, 2014, she and father got into an argument. She said in the past father would hold her down to get her to listen to him, and

this time, he would not let her up. She said he gave her a black eye by hitting her with a book, and he broke the bathroom door. The incident that day was witnessed by her two children. His wife said that, during their year-long relationship, there had been at least five occasions of domestic violence, and the police were called to their residence at least three times. She also reported that two weeks prior, father had tried to commit suicide with a rope, in the shed. His wife said she wanted father to leave the residence, and law enforcement told her she had to give him a 30-day notice. The social worker then spoke to father, and he denied that he had struck his wife with a book. He said he was coming down the stairs, tripped on some toys, and fell into the bathroom door. He then stated that either the book he was holding in his hand or the bathroom door must have struck his wife and caused the bruising. Father also said that he had gone to the shed to pray on his knees, and there was a rope nearby that he picked up. He denied that he attempted suicide. When asked about law enforcement responding to the residence at least three times in the past year, father said that his wife would call her mother, and her mother would call law enforcement. Father said his wife had major trust issues and that counselors had said her lack of trust would continue to cause issues in their marriage. Father said he needed two weeks to get his own place. His current employer was willing to front him the money to get a one-bedroom residence.

The social worker contacted father's domestic violence counselor, who reported that father had been compliant with his domestic violence program. He was surprised about father and his wife, stating that he had met with her at least four times in the past

11

two months, and she did not reveal that father had struck her.  The social worker also contacted the San Bernardino County Sheriff to see if any calls were made regarding father and his wife, in the past year.  The social worker was given a report dated January 2, 2014, for a domestic disturbance and another dated April 1, 2014, for a welfare check.

Given the recent disclosures by father's wife and verification from the police that they had responded to the residence at least twice in the last five months, the social worker changed her recommendation from returning the children to father's custody under family maintenance to terminating his reunification services.

At a hearing held on May 30, 2014, the matter was set contested on behalf of the parents and continued to July 14, 2014.  The matter was subsequently continued to July 29, 2014.

On July 25, 2014, father filed another section 388 petition asking for reunification services and for the children to be returned to his home to live with him and his wife.  As to changed circumstances, he alleged that he reunified with his wife and planned to attend family therapy with her, and he had sought out his own psychiatrist.  As to best interest of the children, father alleged that he had a loving and stable home, and that the children constantly asked to go home with him.  He further alleged that he and the children had a bond, and he loved them.  The court denied the petition, noting that these were issues that were going to be addressed at the upcoming hearing.

The court held a contested 18-month review hearing, beginning on July 29, 2014.  The adoption social worker testified first.  She testified that the current visitation order

was for two times a week for two hours, and she was recommending that the visits be changed to once a month, for one hour. She opined that the current visitation schedule could interfere with adoptive placement steps and the children's transition to a prospective adoptive family.

Father's wife (the wife) also testified. She said that, at the time she called the social worker in May 2014, she and father were struggling in their marriage. Regarding the call, she said that father threw a book, but he was not intentionally aiming at her. She got hit in the nose, and it became sore. She said that father did everything he was asked to do when his services were suspended. She further said he was doing a great job, and he was a great man. Even though she knew of father's domestic violence history, the wife said she did not think that his domestic violence was "resurfacing." She said he was just having a temper tantrum, being a little child, and wanting attention. She added that she had never seen him throw a temper tantrum around the children, and that he was a great father. The wife said she did not recall telling the social worker that father gave her a black eye by hitting her with the book. As for the bathroom door, the wife said father was running toward the bathroom, and he fell over some toys and into the door. The wife described a few instances when she and father were arguing, and she would get up. He would pull her back down by her arms or wrists to prevent her from leaving. The wife said that she would just have to say, "Do you think this is right?" Then, he would let her go. The wife said father was not angry, but rather just frustrated. She said he grabbed her "in a loving way." When asked if she recalled telling the social worker that there had

13

been at least five occasions of domestic violence in their year-long relationship, the wife denied saying there were five instances of domestic violence; rather, she said there were five phone calls to the police. She said that when she first started dating father, she feared his past, so if she thought his temper was going to "come up," she would call the police. Regarding her report that father was trying to commit suicide, she said she saw him crying because she had told him she was done in their relationship. She saw him kneeling, praying, and crying, with a rope beside him. She got scared and called the police. The wife explained that the book incident and the rope incident occurred on the same night. She was upset that he threw the book, told father she was done in the relationship, and then saw father in the shed 30 minutes later. The wife reported the book incident to the police two days later and admitted she was so angry that she told the police she wanted father evicted from her home.

On cross-examination, the wife was asked about the police call she made on January 2, 2014. The police report stated that she wanted her husband to leave because he got violent. The wife explained that father was angry because they were in an argument, and he threw a basket that held the television controller against the wall. It concerned her enough that she called the police. The wife said the call on April 1, 2014 was made by her mother, who reported that father was hitting his head on the wall and "acting crazy." The wife said she was on the phone with her mother, and her mother heard father getting upset over something. Her son was crying, and her mother assumed it was father. The wife also confirmed that there were incidents in April 2013 and

14

December 2013 when she and father were arguing, and he grabbed her to prevent her from leaving. However, she said it was just "husband and wife trying to talk."

Finally, father testified at the hearing. Regarding the book incident, father said there was confusion over the book, and his wife was upset about it. He said he just tossed the book, and it hit her in the face. He said he did not intentionally or aggressively attack his wife, and it was purely an accident. Father testified that he had completed parenting classes and anger management classes, and he had been drug testing negative. He had six more therapy sessions and one more domestic violence class. When asked how he dealt with his feelings of anger or frustration, father said he would go to sleep. He also said he had never been frustrated or angry with his children before. Father agreed with his wife's testimony that he had temper tantrums. He said his wife made him a better person, opened his eyes to his issues, and brought out the best in him.

After the testimonies were presented, counsel presented closing arguments. Father's counsel asserted the position that what happened in this case was that the children were going to be placed in father's home on family maintenance when an accident "or an intentional anger outburst or an incident occurred." He argued that such incident would not have been enough to initiate jurisdiction, and he pointed to the fact that the wife's two other children were living in the home with him and nothing had been filed on their behalf. Counsel asserted that the wife testified that she did not feel threatened by father, and she wanted them to begin therapy to work on their marriage struggles. Next, the children's counsel asked the court to follow the recommendation and

15

terminate father's reunification services. She voiced her concern that both father and his wife minimized father's conduct, calling his conduct temper tantrums, rather than domestic violence. The children's counsel further stated it was not surprising that the wife's children were still in the home because the wife accepted the situation she was in with her children and was taking care of them. Moreover, those children were not a part of the instant case, so they were differently situated. Finally, county counsel argued that, despite all of the services, father had not benefitted enough to the point where the children could be returned to his home. County counsel also asked for visitation to be reduced, since the focus was shifting from reunification to developing permanency. Counsel asserted that CFS needed to get the children transitioned into a new home for possible adoption, and asked for visitation to be reduced to one or two hours a month.

The court noted that it had been 20 months since the removal of the children. The court acknowledged that father had made great strides. However, the court cited that there had been at least three different incidents of domestic violence. The court agreed that the wife had downplayed the incidents when father threw the book and threw the television controller. The court was further not persuaded that father grabbed his wife's wrists in "a loving way", when they were in the midst of arguing. The court viewed father's conduct as domestic violence, noting that it was not appropriate behavior for someone who was taking domestic violence courses. The court stated that it could not find that the children could be returned home, based on the evidence before it. It continued the children as dependents and stated that the children needed permanency.

The court adopted the social worker's findings, terminated reunification services, set a section 366.26 hearing for December 1, 2014, and ordered supervised visitation until then to be a minimum of one time a week for one hour, with the authority to liberalize as to the frequency and duration of the visits.

## ANALYSIS

I. The Court Properly Found That Return of the Children to Father Would Create a Substantial Risk of Detriment

Father argues that there was insufficient evidence of a substantial risk of detriment to the children if returned to his custody. We disagree.

A. *Relevant Law*

Section 366.22, subdivision (a), provides in relevant part: "After considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment."

"Appellate justices review a respondent court's decision after a section 366.22 ruling as follows: 'Evidence sufficient to support the court's finding "must be 'reasonable in nature, credible, and of solid value; it must actually be "*substantial*" proof of the essentials which the law requires in a particular case.' " [Citation.] "Where, as

17

here, a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" [Citations.]' [Citations.] In the presence of substantial evidence, appellate justices are without the power to reweigh conflicting evidence and alter a dependency court determination. [Citations.]" (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705.)

B. *The Evidence Was Sufficient*

Here, one of the reasons for establishing jurisdiction and removing the children involved domestic violence in the home. Mother reported to the social worker that father battered her throughout their relationship, including during both of her pregnancies. Father's physical abuse of her included him pushing her, holding her down, shaking her, and slapping her. Mother was afraid of father and what he was capable of doing to her.

By the time of the 18-month review hearing, father had participated in individual counseling and had almost completed a 52-week domestic violence program. He testified that he had six more therapy sessions and only one more domestic violence class left. Nonetheless, the evidence showed that a few days before the 18-month review hearing, father's wife reported to the social worker that she and father had just gotten into an argument. She said father held her down and would not let her up. She said he gave her a black eye by hitting her with a book, and he broke the bathroom door. Furthermore, the

18

wife said that there had been at least five occasions of domestic violence in the past year, and the police were called to their residence at least three times. She further reported that two weeks prior, father had tried to commit suicide with a rope. At the 18-month hearing, the wife changed her characterization of the book incident and testified that father was not intentionally aiming the book at her, and he was just having a temper tantrum. However, the court logically concluded that she was minimizing his conduct.

In addition, the evidence showed that the wife called the police in January 2014 for a domestic disturbance. She testified that she and father were arguing, and he became angry and threw a basket against the wall. We note that father's conduct concerned her enough that she called the police. The evidence also showed that there were at least two other incidents when she and father were arguing, and he grabbed her to prevent her from leaving. The court reasonably determined that this was not appropriate conduct for someone who had nearly completed a one-year domestic violence program. Thus, the evidence demonstrated that, despite receiving 20 months of services, including the domestic violence program, anger management, and individual therapy, father had not benefitted from those services. Moreover, at that point in the proceedings, the court had to either return the children to father, or terminate services and proceed to devising a permanent plan for the children. (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788.) There was sufficient evidence to demonstrate that the return of the children to father at

19

that time would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the children.[3]

Father contends that the social worker must not have truly considered father to pose a risk to the children since she did not recommend the removal of his wife's two children from her care. However, as the children's counsel noted at the 18-month hearing, those children were not a part of the instant case. Furthermore, they were differently situated. Those children were living with their mother, and she appeared to be protecting them and calling the police when there were domestic violence incidents. In any event, the court here was solely concerned with whether it could find, by a preponderance of the evidence, that the return of father's children to him would create a substantial risk of detriment to them. (§ 366.22, subd. (a).)

Father also points out that he completed parenting classes and drug/alcohol counseling, and he was testing clean. He further asserts that he had substantially completed the domestic violence classes and group therapy and had sought out additional sessions. He had also visited the children regularly. Father appears to be arguing that the mere completion of the technical requirements of his reunification plan is sufficient. He even asserts that his compliance with the reunification plan "should not be discounted by

---

[3] We note father's claim that "the trial court made no finding that the three 'domestic violence' incidents [his wife] relied upon posed any risk of detriment to the children." To the contrary, the court found, by a preponderance of the evidence, that return of the children to father's custody would create a substantial risk of detriment to their safety, protection or physical/emotional well-being. The evidence before the court included the domestic violence incidents.

the May 25 incident reported by [his wife.]"  However, "simply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative."  (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143.)  In other words, participating in the services provided "is one consideration under section 366.22, subdivision (a), but under this statute the court must also consider progress the parent has made towards eliminating the conditions leading to the children's placement out of home."  (*Id.* at pp. 1141-1142.)  Moreover, father's argument demonstrates that he continues to minimize his conduct.  It also shows his lack of understanding that the recent incident displayed his failure to make substantive progress, despite his participation in services.

We conclude that the juvenile court properly assessed father's progress and determined that return of the children to his custody would create a substantial risk of detriment to them.

## II.  The Court Properly Reduced Father's Visitation

After terminating reunification services, ordering the children placed in a concurrent planning home, and setting the section 366.26 hearing, the court reduced the visitation to be supervised visitation, at a minimum of one time a week for one hour, with the authority to liberalize as to the frequency and duration of the visits.  Father asks this court to vacate the juvenile court's visitation order and find that "continued frequent and unsupervised visitation . . . would be in the children's best interests."

21

The court has the authority to determine the right to visitation and the frequency and length of visitation, in light of the particular circumstances of the case before it. (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)

Here, the adoption social worker recommended visitation to be reduced to one time a month because more visitation could interfere with the adoption process. She testified that she would limit the amount of visitation time as the children transitioned to a new adoptive family. She explained that longer visits would take away from the time the children had to bond with the adoptive family. The adoption social worker intended to locate a prospective adoptive family within the next review period. The purpose of the reduction in visits was to gradually phase out the biological parents. Since it was clear that the children would not be returned to father's custody, there was no benefit in continuing more frequent visits. Thus, it was proper for the court to reduce the visitation.

## DISPOSITION

The writ petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

RICHLI
J.

CODRINGTON
J.

22